Kaplan, Mitchell H., J.
The defendant, Rocco Con-sulo, has been indicted for trafficking in an opium derivative (oxycodone) and for possession with intent to distribute this controlled substance, having previously been convicted of possession with intent to distribute a controlled substance. The case is before the court on the defendant’s motion to suppress evidence seized in connection with the motor vehicle stop and search of the car that he was driving just prior to his arrest. A hearing was convened on May 6, 2010. The Commonwealth presented the testimony of Patrolman Daniel Wing of the Saugus Police Department, and offered in evidence one exhibit, a recording of communications between Saugus Police and Police Dispatch. The defendant presented the testimony of Candellaria Ferran, a passenger in the vehicle in question. For the following reasons the motion is ALLOWED.
FACTS
On March 3, 2010, Officer Wing was working the 12:30 A.M. to 8:30 A.M. shift. At approximately 2:15, he was in uniform and alone in a marked cruiser parked in the lot of the Square One Mall in Saugus. He observed a black Audi traveling south on Route One at what he believed to be an excessive speed. He fixed his laser apparatus on the Audi, which clocked the car traveling at 69 miles per hour. The posted speed limit at that location is 50 miles per hour. Officer Wing activated his overhead lights, turned onto Route One, and pulled behind the Audi, which promptly stopped in the breakdown lane about 1000 yards further down Route One, in front of York Ford. Officer Wing parked approximately 15 feet behind the Audi. The area was well lit, and Officer Wing focused his hand-movable spotlight on the side view mirror of the Audi and turned on the fixed spotlights on top of his cruiser. He observed the driver (now the defendant in this indictment) and a passenger seated in the front of the Audi. He entered the Audi’s registration number into the computer terminal in his cruiser. While he waited to receive information concerning the Audi, he observed the defendant adjust his rear and side view mirrors, apparently to watch him. He also observed the defendant to twist his right shoulder to the left and then back to the right in a manner consistent with someone fastening his shoulder belt. Finally, Officer Wing testified that he saw the defendant bend forward so that Officer Wing briefly lost sight of his head and shoulders behind the front seat, perhaps for a couple seconds. The court will return to this aspect of his testimony later.
After receiving information from his computer to the effect that the Audi was properly registered, he walked to the driver’s side of the car. He asked for the defendant’s license and registration, which were produced without incident. He also told the defendant that he saw him putting on his seatbelt and that he ought not move about in the front seat as it could make an officer nervous. He told the defendant to stop moving, and the defendant replied: “I’m sorry.”
Officer Wing returned to his cruiser. It was then his intention to issue a speeding citation to the defendant and had no plan to order him to step out of his car. Officer Wing entered the defendant’s license number into the computer (the defendant was not the registered owner of the Audi) and began writing a speeding citation. While writing, he periodically looked up to check on the occupants of the Audi, which was his customary practice. Officer Wing again observed the defendant to adjust his rear view mirror and briefly to bend forward in his seat, so that he was out of the officer’s view.
At some time during this process, an Officer Fomi radioed Officer Wing that she was coming to assist him. This was, again, regular protocol not occasioned by any concern that Officer Wing expressed regarding the occupants of the Audi. Officer Fomi parked her cruiser in the York Ford parking lot, facing the Audi, but on the opposite side of the guardrail that separated the lot from Route One. At that point, Saugus dispatch radioed Officer Fomi that the defendant had a record of charges for firearm violations and the Officers should use caution. Officer Wing was then still in his cruiser and overheard this radio transmission. He used his on-board computer to request a criminal history of the defendant, which he viewed on his *102 screen. He noted the firearm charges, but did not check to determine dates or dispositions of those charges. While Officer Wing was still in his cruiser, a third police cruiser arrived cariying two additional officers, Amaro and Bellanger.
Officer Wing then approached the Audi with the officers. Officer Forni went to the passenger side and asked Ms. Farren to step out of the car. Officers Wing and Amaro went to the driver’s side. Officer Wing asked the defendant to step out of the Audi. The defendant complied with the officers’ directions and walked to the rear of the car, where Officer Amaro pat-frisked the defendant. He found no weapons or other contraband on the defendant’s person. Officer Wing returned to the car. There were no weapons or other contraband in plain view. He began to search the vehicle. He reached his hand under the driver’s seat where there was a compartment which he described as a “mini-glove box” or “small drawer.” He could not recall its dimensions, although he testified that it was large enough to hold a weapon. He opened the compartment where he found a plastic bag with pills in it. Officer Forni searched the passenger side of the car. Other than the pills, no other contraband was found in the car.
Officer Wing asked the defendant what the pills were, and the defendant responded “percoset.” Officer Wing then asked if the defendant had a prescription for the pills, and the defendant responded “no.” The defendant was placed under arrest and the Audi towed.
Ms. Ferran testified that she was the defendant’s girlfriend and that she and the defendant were returning from a friend’s house when the stop occurred. Although Ms. Ferran was therefore not a disinterested witness, the court finds her to be credible. Her testimony was not materially inconsistent with Officer Wing’s, except in one regard: she testified that she had no memory of the defendant bending forward. I find that this inconsistency between the testimony of the two witnesses can be reconciled. The defendant might well have leaned forward in his seat briefly, for example to check that the underseat compartment was closed, without it having seemed significant and therefore memorable to Ms. Ferran. The court therefore finds that the defendant did bend forward in the front seat of the Audi, very briefly, twice.
DISCUSSION
Officer Wing’s decision to stop the Audi for speeding is not challenged, nor could it be. See Comm. v. Bacon, 381 Mass. 642 (1980). However, “a police officer, in a routine traffic stop, must have a reasonable belief that the officer’s safely, or the safety of others, is in danger before ordering a driver out of a motor vehicle.” Comm. v. Gonsalves, 429 Mass. 658, 662-63 (1999). This court’s decision as to whether, under the circumstances presented by this case, the Saugus police officers had a reasonable belief that their or others’ safely was sufficiently in danger to justify the exit order, followed by the pat-frisk and search of the interior of the Audi, is informed by the Appeals Court’s recent decision in Comm. v. Cruz-Rivera, 76 Mass.App.Ct. 14 (2009), although the precise question now before the court was a question expressly not addressed in that decision.
In Cruz-Rivera, the defendant did not challenge the police order that he get out of the car or the pat-frisk that followed, but only the search of his car after that pat-frisk revealed no contraband. The Appeals Court began by reviewing the applicable law:
even a patfrisk that is valid in its inception may be excessive in its scope. A patfrisk may legitimately extend into the interior of an automobile, but police are confined to what is minimally necessaiy to learn whether the suspect is armed and to disarm him once the weapon is discovered. The sole justification for such a search is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer. In all events, the search must be limited in scope to a protective end. (Internal citations and quotations omitted for simplicity; emphasis added.)
Id. at 18. The Appeals Court then made the following comments concerning the facts of the case before it, which are equally applicable to the instant case:
In this case, the patfrisk of the defendant uncovered no weapons, the officers did not arrest the defendant, and they intended to release him. Under those circumstances, “[i)t can be argued with some persuasiveness that the defendant could hardly be viewed as a potential assailant after he . .. returned to his vehicle and knew that he had not been detained by the police,” citing, Comm. v. Silva, 366 Mass. 402, 409 (1974).
In Cruz-Silva, the Appeals Court, was able to “assume! ] that the police did properly search the car’s interior,” because the contraband that the search disclosed was found inside a small pill bottle, inside the center console, and the Court concluded that a search of this pill bottle clearly went beyond a constitutionally permissible search for a dangerous weapon. Id. In contrast, in the instant case, this court has credited Officer Wing’s testimony that the “mini-glove box” under the driver’s seat was big enough to conceal a gun.
In consequence, the court must consider whether following the pat-frisk, the four officers at the scene had a reasonable belief that their or others’ safety was in danger so as to justify the search of the Audi. It was 2:15 A.M. in a well lit area outside York Ford. There is no evidence that anyone other than the officers was nearby and might be in danger. There is no evidence that this was a high crime area. The Audi had been exceeding the speed limit and the traffic stop and *103 citation were certainly justified, but there is no evidence that the Audi was being driven in such a reckless manner to suggest the commission of crimes other than speeding. At the time of the search, there were four uniformed police officers attending the defendant. The defendant’s only companion was his twenty-one-year-old girlfriend, who appeared to the court during her testimony at the hearing on the instant motion to be soft-spoken and articulate. For his part, the defendant was polite to the officers throughout the stop, promptly produced a valid license and registration, and was compliant with all directives.
On the other hand, Officer Wing saw the defendant bend forward twice so that his head and shoulders disappeared below the front seat. Is that a “furtive” movement? Comm. v. Prevost, 44 Mass.App.Ct. 398, 401 (1998), suggests that it is. Contrast Comm v. Hooker, 52 Mass.App.Ct.683, 686 (2001). However, whether such a movement ought be labeled “furtive” seems to exalt labels over substance. Certainly, it is a movement that could be consistent with someone placing an object under the front seat of the car, or retrieving one. Additionally, at the time of the exit order, the police knew that the defendant had previously been charged with firearm offenses, although none of them knew when those charges had been made nor their disposition.
A person merely bending forward briefly during a routine traffic stop, where — leaving aside the defendant’s prior criminal record — like here there are no attending circumstances suggesting danger or intoxication, ought not be subject to a direction to exit the vehicle and submit to a search. And Officer Wing admitted that before he learned of the defendant’s record, he did not intend to order him from the car. Further, the fact that a person has a criminal record, does not, standing alone, cause him to forfeit his constitutional right to be free from an unreasonable search. In this case, however, the confluence of these factors, in the court’s view, is sufficient to support the order to step out and to be searched.
However, the defendant was compliant with those directives, did not behave in a nervous manner, and had been polite throughout the encounter with the police; and the pat-frisk revealed no contraband. To that point, the police had observed nothing in the interior of the car or on the person of either the defendant or the passenger, Ms. Ferran, that suggested danger or the commission of a crime. Clearly, there were then no grounds to arrest the defendant. Four police officers attended the defendant, and the Audi was surrounded by three cruisers. There is no evidence that anyone else was nearby. In the words of the Appeals Court: “[i]t can be argued with some persuasiveness that the defendant could hardly be viewed as a potential assailant after he . . . returned to his vehicle and knew that he had not been detained by the police.” Cruz-Rivera, 76 Mass.App.Ct. at 18. While a close question, this court is mindful of the admonition that “the search must be limited in scope to a protective end,” and therefore finds that, on these facts, a reasonable person in the position of the four attending officers then present would not have been concerned for their safely, if they had given the defendant a citation and permitted him to drive off with Ms. Ferran. Id.
ORDER
For the foregoing reasons, the defendant’s motion to suppress the pills seized in connection with the stop of the Audi is ALLOWED.